UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| CARLA D. HALL | CIV. ACTION NO. 3:21-02680 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| LASALLE MANAGEMENT CO., L.L.C., ET AL. | MAG. JUDGE KAYLA D. MCCLUSKY |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted [doc. # 20], as supplemented, filed by Defendants, LaSalle Management Company, L.L.C.; Sheriff Andy Brown; and Warden Tim Ducote. The motion is opposed. For reasons explained below, it is recommended that the motion to dismiss, as supplemented, be GRANTED IN PART and DENIED IN PART.

### Background

On August 20, 2021, Carla Hall ("Hall") filed the instant civil rights action against her former employer(s), LaSalle Management Company, L.L.C. ("LMC") and Sheriff Andy Brown, plus Warden Tim Ducote (collectively, "LaSalle"). In response to LaSalle's motions to dismiss, *see* discussion, *infra*, Hall twice amended her complaint, and, thus, the operative complaint at this time is the Second Amended Complaint ("SAC") [doc. # 30].[1]

Hall, who is an African-American female, worked for LaSalle at the Jackson Parish Correctional Center ("JPCC") for a six-month period from March 25 through September 25,

---

[1] An "amended complaint supersedes the original complaint and renders it of no legal effect, unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)). Here, the SAC does not adopt or incorporate the earlier iterations of the complaint.

2019, where she served as a registered nurse, the Director of Nursing and Health Service Administrator, and, eventually as a mental health nurse. However, because of various race-based employment actions, Hall asserted that she suffered a constructive demotion, retaliation, and, ultimately, a constructive discharge.

Hall filed a charge with the Equal Opportunity Commission ("EEOC") "around May 3, 2019,"[2] and received a right to sue letter on or about May 25, 2021. (SAC, ¶ 16). In the SAC, she asserted claims for race discrimination and retaliation in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; and 42 U.S.C. § 1981 via 42 U.S.C. § 1983. (SAC, ¶ 1). She also invoked the court's supplemental jurisdiction to consider unasserted claims under state law. *Id*.

The SAC is comprised of two counts, with multiple claims: 1) race discrimination, constructive demotion and discharge, disparate pay, plus hostile work environment; and 2) retaliation. *Id*., ¶¶ 18-23. Hall seeks an award of compensatory and punitive damages for mental distress, humiliation, past and future embarrassment, and past and future lost income. *Id*. She also seeks punitive damages against LMC, plus Ducote and Brown, in their individual capacities, because they acted with reckless disregard for her federally protected rights by failing to pay her equal wages, imposed racially discriminatory working conditions, created intolerable working conditions, and otherwise permitted discrimination on the basis of race. *Id*., ¶ 24. Should she prevail, Hall also seeks an award of attorney's fees. *Id*., ¶ 26. Finally, Hall requests declaratory and injunctive relief against LaSalle. *Id*., Prayer.

---

[2] If this date is correct, then her EEOC complaint precedes most all of the events at issue in this suit.

LaSalle filed its opening Rule 12(b)(6) motion to dismiss on December 15, 2021.  [doc. # 9].  In response, Hall sought and obtained leave of court to file her First Amended Complaint ("FAC") on January 6, 2022.  [doc. #s 11, 15-16].  In light of the amended pleading, LaSalle withdrew its initial Rule 12(b)(6) and filed the instant motion to dismiss the FAC on January 20, 2022.  [doc. #s 17-18, 20].  However, Hall filed another motion for leave to amend her complaint, which the court also granted.  [doc. #s 22, 27-30].  In so doing, the undersigned explained that when a plaintiff amends her complaint while a motion to dismiss is pending, and defendants maintain that the defects raised in the original motion are not cured by the pleading, then the court may consider the motion to dismiss as being addressed to the amended pleading. *See Rountree v. Dyson*, 892 F.3d 681, 683–84 (5th Cir. 2018).  Accordingly, the court permitted the parties to supplement their memoranda to tailor their arguments to the SAC.  *See* April 8, 2022 Mem. Order [doc. # 29].

On April 22, 2022, LaSalle filed a supplemental memorandum in support of its motion to dismiss.  [doc. # 31].  On May 5, 2022, Hall filed a supplemental opposition to the renewed motion to dismiss.  [doc. # 32].  Finally, on May 12, 2022, LaSalle filed a supplemental reply in support of its motion to dismiss.  [doc. # 33].  Accordingly, the matter is ripe.

## Rule 12(b)(6) Principles

The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  A pleading states a claim for relief when, *inter alia*, it contains a "short and plain statement . . . showing that the pleader is entitled to relief . . ."  FED. R. CIV. P. 8(a)(2).

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007)).  A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  *Plausibility* does not equate to *possibility* or *probability*; it lies somewhere in between.  *See Iqbal, supra*.  Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *See Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965.  Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra* (citation omitted).  A well-pleaded complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable, and that recovery is unlikely.  *Twombly*.

Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions. *Iqbal, supra*.  A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.  *Id*.  Moreover, courts are compelled to dismiss claims grounded upon invalid legal theories, even though they might otherwise be well-pleaded. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827 (1989).

Nevertheless, "[t]he notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." *Gilbert v. Outback Steakhouse of Florida Inc.*, 295 Fed. App'x. 710, 713 (5th Cir. 2008) (citations and internal quotation marks omitted).  Further, "a complaint need not pin plaintiff's claim for relief to a precise legal theory.  Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of [her] legal argument." *Skinner v. Switzer*, 562 U. S. 521, 131 S. Ct. 1289, 1296 (2011).  Indeed, "[c]ourts

4

must focus on the substance of the relief sought and the allegations pleaded, not on the label used." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) (citations omitted). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting *Bell Atl.*, 127 S. Ct. at 1958).

"[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination" to survive a Rule 12(b)(6) motion. *Swierkiewicz v. Sorema*, 534 U.S. 506, 511, 122 S.Ct. 992, 997 (2002); *see also Raj v. Louisiana State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013). The Supreme Court explained that the *McDonnell Douglas* framework[3] "is an evidentiary standard, not a pleading requirement." *Id.* at 510, 122 S.Ct. 992, 997.[4] Accordingly, a plaintiff's complaint need only comply with Rule 8, which requires no more than "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8; *Swierkiewicz*, 423 U.S. at 515, 122 S.Ct. 992.

However, the Fifth Circuit maintains that the prima facie standard *is* relevant at the motion to dismiss stage at least in the sense that a plaintiff is obliged to plead facts as to each of the ultimate *elements* of her claim sufficient to render the case plausible. *Chhim v. Univ. of Texas at Austin*, 836 F.3d 467, 470 (5th Cir. 2016). In other words, it may be helpful to reference the *McDonnell Douglas* framework on which plaintiff must rely if she bases her claim on circumstantial evidence. *Id.* Nonetheless, *McDonnell Douglas* is not dispositive at the pleading stage because it may not even apply if discovery reveals direct evidence of

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

[4] Furthermore, *Twombly* did not overrule *Swierkiewicz*. *See Twombly*, 550 U.S. at 569-70, 127 S.Ct. 1955.

discrimination. *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1212 (5th Cir. 2021), *as revised* (Nov. 26, 2021).

More recently, the Supreme Court has clarified "*McDonnell Douglas* can provide no basis for allowing a complaint to survive a motion to dismiss when it fails to allege essential elements of a plaintiff's claim." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, ___ U.S. ___, 140 S.Ct. 1009, 1019 (2020). Moreover, "the essential elements of a claim remain constant through the life of a lawsuit." *Id*. Therefore, a claim under 42 U.S.C. § 1981 follows the general rule that a "plaintiff must demonstrate that, but for the defendant's unlawful conduct, [her] alleged injury would not have occurred." *Id*. Although the *McDonnell Douglas* framework arose at a time when but-for causation was the undisputed test, a plaintiff still must set forth facts to support the essential elements of her claim to survive a motion to dismiss. *Id*.

### Plaintiff's Allegations

During the relevant period, Defendants, LMC and Sheriff Andy Brown, were Hall's joint employer who made joint decisions regarding her terms of employment. (SAC, ¶ 4). Hall began working for LaSalle as a registered nurse on March 25, 2019. *Id*., ¶ 5. In May 2019, Warden Ducote and Sheriff Brown considered Hall's qualifications and appointed her to Director of Nursing and Health Service Administrator ("DON/HSA") and gave her a $2 per hour raise. *Id*. Hall managed to perform the job successfully, despite being understaffed. *Id*.

On July 1, 2019, Hall felt compelled to step down as DON/HSA because she had not received the support and staff that she had requested from Sheriff Brown and Warden Ducote. *Id*., ¶ 7. Without the additional staff, Hall had to work harder and longer. *Id*. Furthermore, she was not compensated at the same rate as other white employees who held the same position at other correctional centers operated by LMC. *Id*. Hall informed Sheriff Brown and LMC that

6

other positions needed to be filled, including a quality assurance nurse, an assistant to the nurse practitioner, a dentist, and an agency nurse. *Id*. However, these positions remained unfilled until after Hall resigned as DON/HSA. *Id*.

Sheriff Brown and Warden Ducote promoted a white female, Jessie Riesen (sometimes referred to in the SAC as "Reisen") to replace Hall as DON/HSA. *Id*., ¶ 8. Riesen's job duties and title remained the same as Hall's, but she was paid the "correct market rate." *Id*. Within about one week after Hall stepped down as DON/HSA, Riesen re-urged many of the same requests for additional staff and support that Hall had made. *Id*. This time, however, LaSalle quickly acceded to the requests and provided Riesen with the necessary resources. *Id*. Specifically, LaSalle permitted Riesen to hire an agency nurse, a quality assurance nurse, an assistant to the nurse practitioner, and a dentist. *Id*.

Following her promotion to DON/HSA, Riesen proceeded to implement the following series of discriminatory employment practices:

1) All extra staff she hired were white.

2) She fired black employees and replaced them with white employees, many of whom were acquaintances, friends, or associates of Riesen. *See also* ¶ 14.

3) "She changed a practice that only white nurses performed vital signs for incoming prisoners. There would be a minimum of about 50 prisoners at [a] time. The vital signs task only takes a few minutes. Once these were finished, the white nurses were allowed to go home for the day. African-American nurses . . . on the other hand, performed intake which took twice as long on average. Not until the African-American nurses were done, which was usually late, [were they] allowed to leave."

4) When black nurses treated *black* prisoners, Riesen would question the nurses' procedures. However, when nurses treated or examined *white* prisoners, no such delay or questioning occurred. Furthermore, black inmates were made to wait unreasonably long periods of time for dental treatment, but white inmates were not.

5) Riesen excluded black nurses, and Hall in particular, from the nurse's office, but permitted entry to white nurses.

6) Riesen twice moved Hall's desk, until it ultimately was placed in an isolated area.

7) Riesen implemented a new cell phone, dress code, and leave policy, and applied it unequally to blacks and whites.

8) Riesen, Warden Ducote, and Sheriff Brown applied dress and grooming standards unequally. For example, certain black nurses had to wear a coat in the summer. Hair grooming standards also were applied unequally.

9) Riesen unreasonably questioned black nurses about treating black inmates. In fact, LaSalle falsely accused Hall of providing more favorable medical care or attention to African-American prisoners.

(SAC, ¶ 8). Hall contends that these unlawful practices and treatment created a racially hostile work environment. *Id*. Furthermore, Sheriff Brown supported Riesen's discriminatory practices. *Id*., ¶ 14.

On July 18, 2019, Sheriff Brown and Warden Ducote interviewed Hall after they had heard rumors that she was unhappy because of discriminatory treatment. *Id*., ¶ 9. At the meeting, Hall discussed suing Sheriff Brown for paying her unequal wages. *Id*. In return, Sheriff Brown made an implied threat to fire Hall if she talked about her complaint or the racial attitudes of her co-workers. *Id*. Hall felt intimidated. *Id*. Warden Ducote instructed Hall to tell another African-American nurse to stop saying that the JPCC discriminated against Hall because Sheriff Brown did not need that kind of talk. *Id*. Thereafter, Warden Ducote instigated a campaign of intimidation by unequally enforcing dress and grooming codes for nurses. *Id*.

On July 22, 2019, there was a mandatory staff training session that was taught by Major LeBlanc (likely incorrectly named in the SAC as "LeBlance"). *Id*., ¶ 10. LeBlanc played a video at the training session that included background music with racial slurs such as "ni**er,"

that had no relevance to the training.  *Id*.  Hall complained to LeBlanc, who replied that he did

not know how to address the situation.  *Id*.  The next day, LeBlanc played another video that also

had racial slurs, including the word, "ni\*\*er."  *Id*.  This time, however, LeBlanc provided a

disclaimer, stating that the video contained language that some might find offensive.  *Id*.  Hall

reported the language to Sheriff Brown who said that he would discuss the matter with LeBlanc.

*Id*.  However, Brown took no action to remediate the complaint for approximately six months,

i.e., until January 2020.  *Id*.

 Several days after Hall complained about the video and its racial reference, she was

required to take the job of mental health nurse, which was a difficult position requiring Hall to

work longer hours and to work at night.  *Id*., ¶ 11.  Furthermore, her pay was reduced back to

$33 per hour, and she sometimes had to work 18 hours per day.  *Id*.  Several days later, Riesen

excluded Hall from the nurse's office, but permitted white nurses to enter the office even when

Riesen was not present.  *Id*.

 On August 7, 2019, Sheriff Brown convened a meeting of all on-duty nurses to discuss

complaints of discrimination that had been brought to his attention.  *Id*., ¶ 12.  At the meeting,

Brown stated that he had heard about the discrimination complaints levied against Riesen, but he

stood by her actions.  *Id*.  He aggressively "ranted and hollered" at the nurses and told Hall, and

others in attendance, that if they did not like what was going on, they could "hit the door."  *Id*.

Immediately after the meeting, Riesen asked Hall if she was leaving.  *Id*.  Hall told Riesen that

she would not be coming back.  *Id*.

Two days later, on August 9, 2019, Hall provided Sheriff Brown and Warden Ducote with verbal notice of her resignation. *Id*. Sheriff Brown apologized and asked for a couple of days to look into her complaints. *Id*. However, he never got back to Hall. *Id*.

On September 25, 2019, Hall formally resigned because of the intolerable working conditions, including Sheriff Brown's threats to fire her, his failure to address racial complaints, and Riesen's discriminatory practices. *Id*., ¶ 13. Hall contends that she was constructively discharged. *Id*. At the time of her constructive discharge on September 25, 2019, Hall was earning $33 per hour. *Id*. After Hall's resignation, Riesen promoted an unqualified white LPN to assume Hall's position. *Id*.

Hall further asserted that there was widespread nepotism at Jackson Parish Correctional Center that favored family members of white employees. *Id*. Whites disproportionately held managerial positions. *Id*. Moreover, in the medical unit, Sheriff Brown began a practice of firing black nurses and hiring white nurses. *Id*. The nepotism had a disparate impact on black employees. *Id*. White employees received privileges not accorded to others. *Id*.

Pay and hire decisions were made jointly by LMC and Sheriff Brown. *Id*., ¶ 6. Supervision and discipline of nurses was handled jointly by Warden Ducote and Sheriff Brown. *Id*.

## Analysis

### I.    Non-Actionable Individual and Official Capacity Claims

Hall sued Sheriff Brown and Warden Ducote in their official and individual capacities. (SAC, ¶ 3). As one of Hall's alleged joint employers, Sheriff Brown, in his official capacity, is the proper defendant for purposes of her Title VII claim. *See Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 465 (5th Cir. 2001). Moreover, because she is suing the Sheriff as her employer in

his official capacity under Title VII, there is no individual liability against him under Title VII. *Id.*, (citing *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998)). Further, under Title VII, "relief ... is available only against an employer, not an individual supervisor or fellow employee." *Knox v. City of Monroe*, 551 F.Supp.2d 504, 507 (W.D. La. 2008) (quoting *Foley v. University of Houston Sys.,* 355 F.3d 333, 340, n. 8 (5th Cir. 2003)). Accordingly, as seemingly acknowledged by the SAC, Hall does not state a Title VII claim for relief against Sheriff Brown and Warden Ducote, in their individual capacities.

The court further observes that Hall cannot maintain an official capacity claim against Warden Ducote under Title VII or § 1983, where, as here, she has sued her employer, even if the employer is considered a "municipality." *Moton v. Wilkinson*, Civ. Action No. 08-1356, 2009 WL 498487, at *1 (E.D. La. Feb. 26, 2009) (citing *Smith v. Amedisys, Inc.,* 298 F.3d 434, 449 (5th Cir.2002); *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 262 (5th Cir.1999); and *Romero v. Becken,* 256 F.3d 349, 355 (5th Cir. 2001).[5] Accordingly, Hall's official capacity claims against Ducote are subject to dismissal.

In addition, the Supreme Court has held that "the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed

---

[5]  The proper defendant for a § 1983 *Monell* claim is the "official or government body with final policymaking authority over the person who committed the violation." *Lester v. Caddo Par.*, Civ. Action No. 15-2008, 2017 WL 6610329, at *6 (W.D. La. Dec. 27, 2017) (citing *inter alia*, *Burge v. Parish of St. Tammany*, 187 F.3d 452, 469 (5th Cir. 1999)). Therefore, an official capacity suit is viable *only* against the person(s) who is responsible for formulating official policy that caused the constitutional violation. *Stuart v. Russell, et al.,* Civ. Action No. 21-01231, 2021 WL 4820244, at *4 (W.D. La. Oct. 15, 2021) (Doughty, J.); (citations omitted). There is no indication that Warden Ducote was a final policymaker.

by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735; 109 S.Ct. 2702, 2723 (1989).   Nonetheless, § 1981 does not impose "personal liability on elected officials for discrimination in the terms and conditions of local government employment contracts." *Oden*, 246 F.3d at 464.  As an elected official,[6] Sheriff Brown may not be held liable under § 1981 via § 1983, in his individual capacity.  *Davis v. Matagorda Cnty.*, Civ. Action No. 18-0188, 2019 WL 1015341, at *15 (S.D. Tex. Mar. 4, 2019), *R&R adopted*, 2019 WL 1367560 (S.D. Tex. Mar. 26, 2019) (citations omitted); *see also Knox*, 551 F. Supp. 2d at 508, n.6 (noting that it "appears . . . that the Fifth Circuit draws a distinction between elected officials and unelected municipal employees").[7]

Therefore, it is recommended that Hall's official capacity claims against Warden Ducote under Title VII and § 1981 through § 1983, her individual capacity claims against Sheriff Brown and Warden Ducote under Title VII, and her individual capacity claim against Sheriff Brown under § 1981 through § 1983, be dismissed with prejudice.

## II.    Prima Facie Case

Broadly speaking, the "inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII." *Lauderdale v. Texas*

---

[6] LA. CONST. ART. V, § 27 ("In each parish a sheriff shall be elected for a term of four years.").

[7] Hall acknowledged in her brief the existence of case law which suggested that an elected official like Sheriff Brown cannot be sued individually for violations of § 1981.  (Pl. Opp. Brief, pg. 23, n.3) (citing *Knox, supra*).  Nonetheless, Hall attributed this line of authority to an interpretation premised upon Title's VII's 42 U.S.C. § 2000e(f), rather than § 1981.  However, *Knox* relied on a section of the Fifth Circuit's decision in *Oden* that clearly was discussing § 1981, and which necessarily circumscribes this court's autonomy to give effect to Hall's argument.

*Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007) (citing, *inter alia*, *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir. 1996)).  Indeed, "[w]hen used as parallel causes of action, Title VII and [S]ection 1981 require the same proof to establish liability . . . " *Outley v. Luke & Associates, Inc.*, 840 F.3d 212, 220 n.3 (5th Cir. 2016) (citation omitted); *see also Chen v. Ochsner Clinic Found.*, 630 Fed. App'x. 218, 227 (5th Cir. 2015) (analysis of employment discrimination claims under Title VII and § 1981 is identical); *DeGrate v. City of Monroe*, No. 15-2641, 2017 WL 421673, at *4 (W.D. La. Jan. 30, 2017).  Therefore, discriminatory intent may be shown in the same way under § 1983 as under Title VII—by either direct or circumstantial evidence.  *Jones v. Hosemann*, 812 Fed. App'x. 235, 238 (5th Cir. 2020) (citing *Lee v. Conecuh Cty. Bd. of Ed.*, 634 F.2d 959, 961–62 (5th Cir. 1981); *Giles v. City of Dallas*, 539 F. App'x 537, 543 (5th Cir. 2013)).

Title VII prohibits an employer from, *inter alia*, discriminating against any individual with respect to compensation, terms, conditions or privileges of employment because of the individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  Furthermore, the Supreme Court has held that Title VII proscribes the maintenance of "a discriminatorily hostile or abusive environment."  *Matherne v. Ruba Mgmt.*, 624 Fed. App'x. 835, 839 (5th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In addition, § 1981 provides, in pertinent part, that

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1981 "affords a federal remedy against discrimination in private

employment on the basis of race." *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 459–60; 95 S.Ct. 1716, 1720 (1975).[8]  Section 1981 also encompasses retaliation claims.  *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446; 128 S.Ct. 1951, 1954 (2008).  Section 1981, however, does not provide a separate cause of action against local government entities.  *Oden v. Oktibbeha Cty., Miss.*, 246 F.3d 458, 462 (5th Cir. 2001) (citing *Jett v. Dallas Independent School District*, 491 U.S. 701, 731, 109 S.Ct. 2702 (1989)).  Instead, violations of civil rights under § 1981 must be asserted against state actors under § 1983.  *Id.*; *see* discussion, *infra*.

A plaintiff "may prove a claim of intentional discrimination or retaliation either by direct or circumstantial evidence."  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption."  *Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1217 (5th Cir. 1995).  "[S]tatements or documents which show on its face that an improper criterion served as a basis-not necessarily the sole basis, but a basis-for the adverse employment action are direct evidence of discrimination."  *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).

Apart from a statement by Sheriff Brown for nurses to "hit the door," if they did not care for the discriminatory work environment, Hall otherwise does not argue that her claims were supported by direct evidence of discrimination.  Accordingly, she must rely on circumstantial evidence to support her claims.  When, as here, a case is prosecuted on the basis of circumstantial evidence, the courts employ the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973).  Under this framework, the plaintiff first must

---

[8] Even an at-will employee stands in a contractual relationship with her employer and thus may maintain a cause of action under § 1981.  *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1050 (5th Cir. 1998).

establish a prima facie case of discrimination or retaliation.  *Id.*

Again, Hall alleged claims for race discrimination, constructive demotion and discharge, disparate pay, hostile work environment, and retaliation.[9]  The court will address these claims, and LaSalle's arguments as they relate to them, in turn.

Insofar as Hall endeavored to sue Sheriff Brown in his official capacity (and LMC, *see* discussion, *infra*) for violations of § 1981 through § 1983,[10] she is required to show that the challenged conduct represented a custom or policy of the local government agency.  *Evans v. City of Houston*, 246 F.3d 344, 358 (5th Cir. 2001) (plaintiff cannot proceed under a theory of respondeat superior and must instead satisfy the "custom or policy" test fashioned for suits against a municipality under § 1983)  (citations omitted); *Knox, supra* (even if plaintiff had sued defendants for violations of rights provided by § 1981 through § 1983, she failed to allege a city policy or custom that resulted in the discrimination against her).

Accordingly, after considering whether Hill has stated a prima facie case to support her claims for violations of § 1981 through § 1983, the court must consider whether the challenged conduct represented a custom or policy of the local government agency.  *See* discussion, *infra*.

Furthermore, "[c]laims against individual public officials under § 1981 are subject to the defense of qualified immunity, as are claims against such individuals under § 1983."  *Foley v.*

---

[9] It is the court's understanding that Hall voluntarily dismissed any conspiracy claim under 42 U.S.C. § 1985 via the SAC.

[10]  It is less than clear from the SAC or the memoranda whether Hall endeavored to set forth claims against Sheriff Brown in his official capacity and LMC for violations of § 1981 through § 1983.  However, the court will consider the SAC, as if she so intended.  Certainly, Rule 8 does not "countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11–12; 135 S.Ct. 346, 346–47 (2014).

*Univ. of Houston Sys.*, 355 F.3d 333, 338 (5th Cir. 2003) (internal citations omitted). Here, Warden Ducote raised qualified immunity as a defense, and thus, the court must consider whether he is entitled to qualified immunity as to the remaining individual capacity claims asserted against him under § 1981 through § 1983. *See* discussion, *infra*.

a)    Hostile Work Environment/Harassment

To establish a hostile work environment claim under Title VII, plaintiff must demonstrate that she

> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citations omitted). In assessing whether harassing conduct is sufficiently severe or pervasive to affect a term, condition, or privilege of employment depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" or workplace competence." *Peterson v. Linear Controls, Inc.*, 757 Fed. App'x. 370, 374 (5th Cir. 2019) (citations omitted); *Hernandez, supra*; *West v. City of Houston, Texas*, 960 F.3d 736, 742 (5th Cir. 2020).

Furthermore, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Hernandez, supra*. In other words, a subjective belief of racial motivation, without more, is insufficient to show a hostile work environment. *Cavalier v. Clearlake Rehab.*

16

*Hosp., Inc.*, 306 Fed. App'x. 104, 107 (5th Cir. 2009). A one-time use of a racial epithet does not establish a hostile work environment. *See Peterson, supra* (citation omitted). Even an occasional racially insensitive joke is insufficient. *West, supra.*

Moreover, "[i]solated incidents do not support a hostile work environment claim unless the complained-of incident is 'extremely serious' in nature." *Higgins v. Lufkin Indus., Inc.*, 633 Fed. App'x. 229, 235 (5th Cir. 2015) (citations omitted). Thus, "[d]iscourtesy or rudeness, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) (citations and internal quotation marks omitted). In short, Title VII is not a general civility code for the American workplace. *West*, 960 F.3d at 743.

LaSalle contends that the SAC does not sufficiently plead elements four and five of Hall's prima facie case for her hostile work environment claim. In so doing, LaSalle emphasized that the "oral utterance of the N-word and other racially derogatory terms, even in the presence of the plaintiff, may be insufficient to establish a hostile work environment." *Collier v. Dallas Cnty. Hosp. Dist.*, 827 Fed. App'x. 373, 378 (5th Cir. 2020), *cert. denied,* 141 S.Ct. 2657 (2021) (citations omitted); *see also Mosley v. Marion Cnty., Miss.*, 111 Fed. App'x. 726, 728 (5th Cir. 2004) (three incidents involving the use of racial slur does not create an issue of material fact to sustain a plaintiff's hostile work environment claim).

However, "it is well established that '[u]nder the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim.'" *Henry v. CorpCar Servs. Houston, Ltd.*, 625 Fed. App'x. 607, 611–12 (5th Cir. 2015) (citations omitted). Moreover, in a published decision, the Fifth Circuit recently joined other circuits in

recognizing that "[p]erhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as [the N-word] by a supervisor in the presence of his subordinates." *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022) (quoted sources omitted).

Here, Hall alleged that Major LeBlanc played training videos at a mandatory staff training in front of Hall and her co-workers, which included music with racial slurs, such as "n**er." By virtue of his rank, the court plausibly may infer that LeBlanc served in a supervisory capacity. Moreover, although Hall complained to LeBlanc about the offensive language in the video, LeBlanc played another video the very next day that contained the same racial slurs, despite acknowledging that some employees might find the language offensive.

To be sure, the apparent indifference by Major LeBlanc to the use of racial slurs in training videos is not as severe as a supervisor calling an employee a racial slur to her face in front of her co-workers, *see Woods, supra*. Hall, however, has alleged other facts to support her hostile work environment claim. For example, she alleged that the Director of Nursing, Jessie Riesen, unreasonably questioned black nurses about the care that they provided to black inmates. Black inmates received medical and dental care less quickly than white inmates. Riesen also began to systematically discipline and discharge blacks so she could replace them with less qualified white employees. Riesen excluded black nurses, including Hall, from the nurse's office. Riesen also implemented disparate cell phone, dress code, and leave policies based on race. Riesen enacted the foregoing practices or policies, which suggests that they were ongoing, with no indication that they were changed or abated prior to Hall's constructive discharge.

In sum, Hall has alleged that she was subjected to objectively offensive conduct that,

18

when considered in the light most favorable to her, may be deemed humiliating.  Furthermore, the conduct unreasonably interfered with her work performance, i.e., the provision of medical care to all prisoners, regardless of race.  Finally, the offensive conduct (the procedures enacted by Riesen) was of an ongoing and indefinite duration.  The climate of distrust and undisguised hostility towards black nurses, including Hall, was only accentuated by Major LeBlanc's indifference towards the use of racial slurs in training videos.

Accordingly, upon consideration of the totality of the circumstances, and after drawing all reasonable inferences in favor of Hall, the undersigned finds that the SAC sets forth sufficient facts to plausibly show that the harassment experienced by Hall affected a term, condition, or privilege of employment, as required to meet the fourth element of her prima facie case of her hostile work environment claim.  *See Johnson v. Halstead*, 916 F.3d 410, 418 (5th Cir. 2019) (whether the harassment impacts the "terms or conditions of employment" is key).

LaSalle further argues that Hall failed to allege facts to show that her employer knew or should of known of the alleged harassment, and then failed to take prompt remedial action.  First, where a superior participates in the alleged harassment, then a plaintiff need not prove the fifth element.  *See EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 444, 453 (5th Cir. 2013) (en banc).[11] Hall plainly alleged that Sheriff Brown called a nurses' meeting to discuss complaints of discrimination that had come to his attention.  (SAC, ¶ 12).  Two days later, Sheriff Brown asked Hall for a "couple of days" to look into her complaints before she resigned, but he never did.  *Id*.

---

[11] A supervisor under Title VII is defined as a person with the authority to make decisions that "effect a significant change in [an employee's] work status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or decisions causing a significant change in benefits."  *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013).  Under this definition both Sheriff Brown and, at least arguably, Riesen and Ducote were Hall's supervisors.

In addition, Hall alleged facts to show that Sheriff Brown supported and effectively endorsed Riesen's discriminatory practices. *Id.*, ¶¶ 12, 14. Finally, Hall complained to Brown about LeBlanc's use of racial slurs in training videos, but Brown took no action to address the complaint until months after Hall's constructive discharge. *Id.*, ¶ 10.

In short, to the extent Hall must do so, she has alleged sufficient facts to plausibly allege that LaSalle knew or should have known of the harassment that formed the basis for her hostile work environment claim, but failed to take *prompt* remedial action. Furthermore, "an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior." *Vance*, 570 U.S. at 427.[12]

LaSalle not only failed to respond to complaints, it also effectively discouraged complaints from being filed (e.g., telling Hall and other nurses to "hit the door," if they did not care for LaSalle's employment practices). Therefore, the SAC includes facts to plausibly establish that LaSalle intentionally or negligently created or helped to perpetuate a hostile work environment. If established, LaSalle is subject to liability. *Vance*, 570 U.S. at 448-49.

b)    <u>Discrimination and Constructive Demotion/Discharge</u>

---

[12] When a harasser is not otherwise a supervisor (i.e., someone empowered to take tangible employment actions),

> a plaintiff [may] still prevail by showing that his or her employer was negligent in failing to prevent harassment from taking place. Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant.

*Vance, supra*.

To establish a prima facie case of race-based discrimination, a plaintiff must show that she "(1) is a member of a protected class, (2) was qualified for the position, (3) was subject to an adverse employment action, and (4) was replaced by someone outside her protected class or was treated less favorably than other similarly situated employees outside her class." *Melvin v. Barr Roofing Co.*, 806 Fed. App'x. 301, 305 (5th Cir. 2020) (quoting *Haire v. Bd. of Sup'rs of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013)**);** *McCoy*, 492 F.3d at 556**.**

Hall is African-American, and, thus, belongs to a protected class. Although LaSalle contends that Hall did not allege facts to show that she was qualified for either the position of DON/HSA or mental health nurse, LaSalle hired Hall for these jobs and, at the pleading stage, this circumstance supports the reasonable inference that she was so qualified. *See Berquist v. Washington Mut. Bank*, 500 F.3d 344, 350 (5th Cir. 2007) (where plaintiff possesses the same job qualification at the time that she suffered the adverse employment action as when her employer placed her in that position, then she need not otherwise show that she was qualified); *Singleton v. Town of Vidalia*, Civ. Action No. 10-0163, 2011 WL 4591064, at *2 (W.D. La. Sept. 30, 2011) (defendant hired plaintiffs to work in the town's newly created position and, thus, plaintiffs are presumed to be technically "qualified" for the positions); *Roby v. Frontier Enterprises, Inc.*, Civ. Action No. 11-368, 2012 WL 4321312, at *2 (W.D. Tex. Sept. 19, 2012) (plaintiff was hired and, thus, presumably qualified for the position); *Valles v. Frazier*, Civ. Action No. 08-501, 2009 WL 3617534, at *3 (W.D. Tex. Oct. 27, 2009), *clarified on denial of reconsideration,* 2009 WL 4639679 (W.D. Tex. Nov. 30, 2009) (although not pled in the complaint, it is reasonable to infer that plaintiff was qualified for her position because, *inter alia*, defendant hired her for the position).

21

In the SAC, Hall asserted that LaSalle's racially discriminatory conduct culminated with her constructive demotion and constructive discharge. LaSalle contends that Hall failed to allege sufficient facts to state a "claim" for constructive demotion or discharge. However,

> under federal law, the constructive discharge doctrine is an alternative way of proving an adverse employment action in Title VII and other cases, but constructive discharge is not itself a cause of action. It is a means of proving the element of an adverse employment action where the employee quits instead of being fired.

*Wells v. City of Alexandria*, No. 03-30750, 2004 WL 909735, at *3 (5th Cir. Apr. 29, 2004) (unpubl.). In effect, LaSalle maintains that Hall failed to allege requisite facts to plausibly infer that she was subjected to an adverse employment action, as required to support her discrimination claim.

For Title VII discrimination claims, adverse employment actions contemplate "ultimate employment decisions" such as hiring, firing, demoting, promoting, granting leave, and compensation. *Thompson v. City of Waco, Texas*, 764 F.3d 500, 503 (5th Cir. 2014) (citations omitted); *Peterson v. Linear Controls, Inc.*, 757 Fed. App'x. 370, 373 (5th Cir. 2019) (citation omitted). Thus, "an employment action that does not affect job duties, compensation, or benefits is not an adverse employment action." *Thompson, supra* (cleaned up). Additionally, a transfer or reassignment may constitute a demotion (regardless of pay, title, or grade), so long as it is objectively worse – such as less prestigious, interesting, or with less room for advancement. *Id*.

Here, Hall alleged that Riesen applied a leave policy unequally to whites and blacks. (SAC, ¶ 8). Riesen also assigned duties to African-American nurses such as Hall that took twice as long as white nurses, thereby requiring African-American nurses to stay later. *Id*. This race-based unequal leave policy and race-based job duty assignments may constitute adverse employment actions, irrespective of Hall's constructive demotion and discharge allegations.

22

In any event, the court further finds that Hall has alleged facts to support plausible adverse employment actions on the basis of constructive demotion and/or discharge. First, a job transfer or reassignment that was initiated by an employee, nonetheless may be considered *involuntary* when the employer created or permitted conditions so intolerable that a reasonable person would be compelled to make the switch. *See Sharp v. City of Houston*, 164 F.3d 923, 934 (5th Cir. 1999) (discussing constructive demotion in the context of retaliatory adverse employment action); *see also Gibbs v. City of Houston*, Civ. Action No. 18-4278, 2020 WL 7696093, at *5 (S.D. Tex. Dec. 28, 2020) (the plaintiff-employee must provide evidence of intolerable working conditions that would compel a reasonable person to leave).

Hall alleged that when she was DON/HSA, LaSalle required her to work much longer hours without necessary support staff and at a rate of pay that was lower than the rate paid to white employees who held the same position at other correctional centers operated by LMC. (SAC, ¶ 7). Hall complained to LaSalle about the staff shortage and conditions, but nothing was done. *Id*. Of course, only one week after Hall stepped down from her position, her white replacement, Riesen, made similar requests for additional staff and support, which LaSalle quickly accommodated. *Id*. The fact that Hall's replacement apparently could not tolerate the same work conditions that Hall faced lends plausible credence to Hall's allegation that LaSalle endorsed objectively intolerable working conditions, which resulted in Hall's constructive demotion.

Similarly, "[a] constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." *McCoy*,

492 F.3d at 557 (quoted source omitted).  In determining whether an employee suffered a constructive discharge, the court must examine the following factors:

> 1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

*Id.* (citations omitted).  The inquiry is objective.  *Id*.  Mere harassment alone is insufficient. *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 331-332 (5th Cir. 2004) (citation omitted).  "Ultimately, to succeed on a constructive discharge claim, the plaintiff must show a greater degree of harassment than is required for a hostile work environment claim."  *Id*.

Again, Hall alleged facts showing that she was subjected to a constructive *demotion* that plausibly was motivated by race, with a concomitant reduction in job responsibilities.  Moreover, once Hall complained about Major LeBlanc's use of, and apparent ambivalence towards the use of a racial slur, she was reassigned to the position of mental health nurse, which required longer hours with up to 18-hour workdays, lower pay, and working at night.  When coupled with the facts supporting Hall's hostile work environment claim, *see* discussion, *supra*, the court finds that Hall has stated sufficient facts to plausibly support her constructive discharge allegation, via five of the six pertinent factors.[13]

As to the fourth and final element of her prima facie case of discrimination, Hall alleged that she was replaced by a white person after both her constructive demotion and discharge.  Of

---

[13] Needless to say, LaSalle places its own spin on Hall's allegations.  At this stage of the proceedings, however, the court must construe the facts in a light most favorable to plaintiff.

course, she also alleged that, during her tenure, she was treated less favorably than similarly situated white nurses.

In its brief, LaSalle also argued that Hall failed to identify an appropriate comparator for purposes of her unequal wage claim while she served as DON/HSA, which represents a more specific subset of her general discrimination claim.  As part of her prima facie case of wage discrimination, Hall "must show that [s]he was a member of a protected class and that [s]he was paid less than a non-member for work requiring substantially the same responsibility."  *Mitchell v. Mills*, 895 F.3d 365, 370–71 (5th Cir. 2018) (quoting *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008).  Moreover, a plaintiff "must show that h[er] circumstances are nearly identical to those of a better-paid employee who is not a member of the protected class."  *Id.* (citations and internal quotation marks omitted).  In this regard, "a variety of factors are considered, including job responsibilities, experience, and qualifications."  *Id.*

Hall alleged that, while she was DON/HSA, she was not paid the same rate as other whites who held the same position at other correctional centers operated by LMC.  LaSalle faults Hall for failing to identify these persons and for failing to allege any facts showing their job responsibilities.  However, there is no binding authority in this circuit requiring a plaintiff to identify a comparator by name at the pleading stage.  *Nikolova v. Univ. of Texas at Austin*, Civ. Action No.  19-0877, 2020 WL 6703239, at *5 (W.D. Tex. Nov. 13, 2020) (citations omitted).  In any event, Hall alleged that these comparators held the same position as she did, which plausibly suggests that the responsibilities and duties were the same.

LaSalle also takes issue with Hall's attempt to rely on Riesen as a comparator because their tenures did not overlap, and their responsibilities were not the same.  However, the

comparator need not always be employed at the same time as the plaintiff.  *See Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981) (unequal pay case analysis remains the same even when the two employees were employed at different times in the same position).  Moreover, Hall alleged that she had *more* responsibilities and job duties than Riesen, which plausibly suggests that, rather than equal pay with Riesen, Hall should have received greater pay than Riesen.  LaSalle, however, paid her less than Riesen.  While a difference in experience or qualifications might explain the discrepancy, plaintiff need not prove her case at the pleading stage.  Rather, she need only show a plausible claim for relief; a burden that she has met.

      c)    <u>Retaliation</u>

A prima facie case of retaliation under Title VII contemplates three elements:  "(1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action."  *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (citation omitted).

An employee has engaged in a protected activity when she "either (1) opposed any practice made an unlawful employment practice by Title VII or (2) if she made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII."  *Id.* (citation and internal quotation marks omitted).  For purposes of the second element of the prima facie case, the challenged action must be "materially adverse," i.e., that it is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945 (5th Cir. 2015) (citation and internal quotation marks omitted).

Finally, "[c]lose timing between an employee's protected activity and an adverse action against h[er] may provide the causal connection required to make out a *prima facie* case of retaliation." *McCoy*, 492 F.3d at 562.

It is manifest that Hall engaged in protected activity when she reported Major LeBlanc's offensive comment. *See Foster v. Ferrellgas, Inc.*, 834 Fed. App'x. 88, 90–92 (5th Cir. 2020) (Title VII protects informal complaints so long as the plaintiff "reasonably believed" the challenged employment practice violated Title VII). Nevertheless, LaSalle argues that Hall failed to allege that she suffered an adverse employment action or the existence of a causal link. However, Hall stated that several days after she complained about the racially offensive videos, she was reassigned to the position of mental health nurse, which was a difficult position requiring longer hours and working at night. (SAC, ¶ 11). Furthermore, LaSalle reduced her pay. *Id*. LaSalle's actions eventually culminated in Hall's constructive discharge.

The Fifth Circuit has recognized that "a retaliatory shift change that places a substantial burden on the plaintiff, such as significant interference with outside responsibilities or drastically and objectively less desirable hours, can dissuade an employee from reporting discrimination." *Johnson v. Halstead*, 916 F.3d 410, 417–22 (5th Cir. 2019). At the pleading stage, Hall's allegations satisfy the foregoing criteria. Furthermore, the undersigned has found that Hall has pled sufficient facts to support her constructive discharge allegation. *See* discussion, *supra*. While Hall may not have suffered constructive discharge until two months after she complained about LeBlanc's endorsement of racial epithets, LaSalle took the retaliatory measures that eventually compelled her forced resignation mere days after she lodged her complaint. The proximity of the retaliatory actions suffices to support a causal connection. *See Evans v. City of*

*Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (time lapse of five days is sufficient to provide a "causal connection").

**III.    *Monell* Liability**

a)    <u>Law</u>

"In a Section 1983 case, the burden of proving the existence of an unconstitutional municipal policy or established custom rests upon the plaintiff." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989).  "To proceed beyond the pleading stage, a complaint's description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (citation and internal quotation marks omitted).  Therefore, to plausibly plead a widespread practice as required to support municipal liability, a plaintiff must describe more than the lone incident that gave rise to her own injury.  *Id.* (citation omitted).

To establish municipal liability under § 1983, a plaintiff must prove that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009); *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-94 (1978).  "A municipality is almost never liable for an isolated unconstitutional act on the part of an employee; it is liable only for acts directly attributable to it through some official action or imprimatur." *Peterson*, 588 F.3d 838 at 847 (internal quotations omitted).  Further, municipalities are not liable under § 1983 on the theory of *respondeat superior.  Id.*; *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985).

The official policy requirement may be met in various ways, including written policy statements, regulations, ordinances, or "widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citations and internal quotations omitted). The two most common ways of establishing the existence of a custom or policy is by demonstrating (1) a pattern of unconstitutional conduct by municipal actors or employees; or (2) a single unconstitutional act by a final policymaker. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010). Indeed, "[i]t is well-established that a single unconstitutional action by a municipal actor may give rise to municipal liability if that actor is a final policymaker." *Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 548 (5th Cir. 2008) (citing *Woodard v. Andrus,* 419 F.3d 348, 352 (5th Cir. 2005); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480; 106 S.Ct. 1292, 1298 (1986). Further, "[a]lthough a policymaker's single decision may be in effect a policy that creates liability for a municipality, the situations to which this exception applies are few and will create municipal liability only if the municipal actor is a final policymaker." *Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 Fed. App'x. 317, 320 (5th Cir. 2020) (citation omitted).

Hall invoked still a third way to impose municipal liability pursuant to a ratification theory, which provides that

> if authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. The theory of ratification, however, has been limited to "extreme factual situations." Therefore, unless the subordinate's actions are sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom.

29

*World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (cleaned up) (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915 (1988)).

      b)    <u>Discussion</u>

In this case, there is no question but that, as a parish sheriff, Brown is a final policymaker. *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir.2003); *Stuart v. Russell, et al.*, Civ. Action No. 21-01231, 2021 WL 4820244, at *4 (W.D. La. Oct. 15, 2021) (Doughty, J.); *Lester v. Caddo Par.*, Civ. Action No. 15-2008, 2017 WL 6610329, at *6 (W.D. La. Dec. 27, 2017) (citing *Craig v. St. Martin Parish Sheriff*, 861 F. Supp. 1290, 1300 (W.D. La. 1994) and La. Const. Art. 5, § 27).

Furthermore, the SAC is replete with allegations that Sheriff Brown enacted, endorsed, or ratified the discriminatory and retaliatory acts that form the basis of Hall's suit.  For example, Sheriff Brown promoted Hall and then failed to provide her with necessary support and staff. (SAC, ¶¶ 4-8).  Brown promoted Riesen in Hall's stead.  *Id.*, ¶ 8.  Brown interviewed Hall regarding her displeasure with her discriminatory treatment.  *Id.*, ¶ 9.  Hall complained to Brown about Major LeBlanc's repeated use of racial slurs in training videos, but Brown took no remedial action until months after Hall's constructive discharge.  *Id.*, ¶ 10.  At a meeting of nurses, Brown defended Riesen's discriminatory practices and chastised and berated any staff who disapproved of the practices.  *Id.*, ¶ 12.  After Hall told Brown that she intended to resign, Brown asked for time to look into her complaints.  *Id.*  Despite this opportunity to redress the alleged discriminatory practices, Brown never did.  *Id.*  Finally, Brown encouraged the hiring of whites as nurses while systematically disciplining and discharging black nurses.  *Id.*, ¶ 14.

In short, Hall's allegations suffice to support single-incident or policymaker ratification *Monell* liability against Brown as Jackson Parish Sheriff, as required to state a claim for violations of § 1981 through § 1983. Therefore, it is recommended that the motion to dismiss be denied in this regard.

The undersigned further observes that, because LMC is a private prison-services entity, courts in this district have treated LMC like a municipality or local government entity such that it "may not be held liable based on respondeat superior, but only under the limited framework of *Monell* and similar authority." *Ivory v. Burns*, Civ. Action No. 03-2102, 2006 WL 8456374, at *3 (W.D. La. Feb. 8, 2006), *R&R adopted,* 2006 WL 8456375 (W.D. La. Mar. 1, 2006); *Ball v. Book*, Civ. Action No. 19-1283, 2022 WL 509389, at *6 (W.D. La. Feb. 18, 2022); *Moore v. LaSalle Corr., Inc*, 429 F.Supp.3d 285, 289 (W.D. La. 2019); *see also Knox, supra* (citing *Evans v. City of Houston,* 246 F.3d 344, 358 (5th Cir.2001) (for a plaintiff to recover against a municipality under § 1981, she "cannot proceed under a theory of respondeat superior and must instead satisfy the 'custom or policy' test fashioned for suits against a municipality under § 1983.")).

Here, apart from a conclusory allegation that LMC and Sheriff Brown made "joint decisions" regarding Hall's employment, the SAC is devoid of allegations that LMC had a custom or policy endorsing the alleged discriminatory and retaliatory actions at issue in this case. Accordingly, Hall fails to state a claim for relief against LMC for violations of § 1981 through § 1983, and it is recommended that the motion to dismiss be granted and these claims be dismissed with prejudice.

31

IV.    **Qualified Immunity**

a)    <u>Law</u>

When, as here, a plaintiff seeks money damages from government officials in their individual capacities under § 1983, the affirmative defense of qualified immunity is available to protect defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). The qualified immunity doctrine balances two often conflicting interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. As such, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citations and internal quotation marks omitted).

In effect, qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (citing *Malley v. Briggs,* 475 U.S. 335, 343, 341, 106 S.Ct. 1092 (1986) (internal quotation marks omitted).

Qualified immunity is nominally characterized as an affirmative defense. However, once raised by defendants, it devolves upon the plaintiff to negate the defense by showing that the officials' conduct violated clearly established law. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citation omitted). Plaintiff's burden is two-pronged. *Club Retro LLC v. Hilton*, 568

F.3d 181, 194 (5th Cir. 2009) (quoted sources omitted).  First, a plaintiff must demonstrate that defendant(s) violated a constitutional right under current law.  *Id*.  "Second, [plaintiff] must claim that the defendant[s'] actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."  *Id*.  (quoted source and internal quotation marks omitted); *see also Johnson v. Halstead*, 916 F.3d 410, 416 (5th Cir. 2019) (citation omitted); *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015).  The courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citation omitted).

A law is clearly established when there exists "controlling authority or a 'robust consensus of persuasive authority' that defines the contours of the right in question with a high degree of particularity."  *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013).  Although a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question *beyond debate*."  *Id*.  (citations and internal quotation marks omitted).  Nonetheless, there is the "rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances."  *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (citations and internal quotation marks omitted).

In the end, the question becomes whether the right is "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right."  *Hogan, supra* (citations and internal quotation marks omitted).  Because it is plaintiff's burden to establish that the challenged conduct violated clearly established law, the district court may, but

is by no means obliged to undertake the clearly established law analysis on its own.  *See Joseph, supra*.

Supervisory officials are not liable under § 1983 for the actions of subordinates under any theory of vicarious liability.  *Turner v. Lieutenant Driver*, 848 F.3d 678, 695 (5th Cir. 2017) (citation omitted); *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) ("Section 1983 does not create supervisory or *respondeat superior* liability.").   Rather, to impose individual liability against a supervisor under § 1983, plaintiff must establish each defendant's (1) "personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008) (citation omitted).[14]   In other words, "the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor."  *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997).

"[A] supervisory official may be liable under section 1983 if that official, by action or inaction, demonstrates a deliberate indifference to a plaintiff's constitutionally protected rights."  *Id*. (citation omitted).  However, "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id*. (citations and internal quotation marks omitted).

---

[14] Supervisory liability obtains "if (1) [the supervisor] affirmatively participates in the acts that cause the constitutional deprivation, or (2) [the supervisor] implements unconstitutional policies that causally result in the constitutional injury."  *Peña v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).

b)    <u>Discussion</u>

In this case, Hall alleged that Warden Ducote was in charge of the JPCC, including the provision of medical care to prisoners.  (SAC, ¶ 3).  He supervised Hall and had the power to hire and fire all nurses.  *Id*.  Hall further asserted that Warden Ducote promoted her to DON/HSA, and then she was constructively demoted from the position when Ducote failed to provide her with necessary support and staff that she had requested from him.  (SAC, ¶¶ 5, 17).  Ducote then promoted a white female, Riesen, to replace Hall.  *Id*., ¶ 8.

Ducote also interviewed Hall about rumors that she was unhappy because she had been treated in a discriminatory manner, including payment of unequal wages.  *Id*., ¶ 9.  Thereafter, Ducote engaged in a campaign of intimidation by unequally enforcing dress and grooming codes for nurses.  *Id*.  Hall alleged that Ducote ratified the racially discrimination practices at the JPCC when Sheriff Brown called a meeting of nurses on August 7, 2019, to discuss, and defend, complaints of discrimination and the discriminatory practices of Riesen.  *Id*., ¶ 12.  Furthermore, Ducote was present on August 9, 2019, when Hall stated that she intended to resign, and Sheriff Brown asked for some time to look into her complaints.  *Id*.  However, nothing was ever done. *Id*.

Upon consideration, the court finds that Hall has alleged sufficient facts to show that Ducote was involved in, or aware of her complaints of race-based discrimination and harassment, including unequal pay, which plausibly culminated with her constructive demotion and discharge.  Indeed, Hall alleged that Ducote was aware of Riesen's discriminatory practices and harassment but took no steps to redress the situation.  The following characterization of plaintiff's complaint from *Johnson v. Halstead* applies with equal force here,

> [t]he . . .allegations of [defendant's] inaction after learning about the unconstitutional work environment is the definition of deliberate indifference and thus would amount, if proven, to a violation of clearly established law. Of course, they are just allegations at this point, and the evidence may end up showing the opposite. But the allegations are plausible enough to allow [plaintiff] to engage in the full discovery process and find out if there is evidence to back them up.

*Johnson*, 916 F.3d at 419.[15]

Nonetheless, Hall has not alleged requisite facts to show Ducote's personal involvement in, or indifference towards retaliatory conduct that violated clearly established law.  First, Hall admitted that the prohibition against a retaliatory hostile work environment under §§ 1981 and 1983 is not clearly established in this circuit.  (Pl. Opp. Brief, pgs. 24-25).  Second, Hall did not allege that Ducote was responsible for her reassignment after she complained about LeBlanc's repeated use of a racial slur.  At most, Hall stated that, once she complained about unequal wages to Sheriff Brown and Warden Ducote, he commenced a "campaign of intimation" by unequally enforcing dress and grooming codes of nurses.  (SAC, ¶ 9).  However, Hall did not adduce case law to show that it was clearly established that unequal enforcement of dress and grooming codes constitutes an adverse employment action that would "dissuade a reasonable worker from making or supporting a charge of discrimination."[16]

---

[15] In 2019, the Fifth Circuit acknowledged that hostile work environment claims under the Equal Protection Clause have been clearly established for quite some time within the circuit.  *Davis, supra* (citing *Johnson*, 911 F.3d at 274). Furthermore, the "constitutional prohibitions against race . . . discrimination are so clearly established that a reasonable person would be aware of these rights."  *Id*. (citations omitted).

[16] In a footnote embedded in her supplemental brief, Hall alluded to a potential First Amendment retaliation claim.  (Pl. Suppl. Brief, pg. 9 n. 2).  However, she did not advance such a claim in her SAC.  Even if she had, there is no indication that she made any statements *as a citizen*.  *See Johnson,* 916 F.3d at 422-423 (discussing requirements of First Amendment retaliation claim).

Accordingly, the undersigned finds that Hall has not overcome Warden Ducote's qualified immunity defense as to her retaliation claim, and it is recommended that this claim against Warden Ducote be dismissed with prejudice.

## V.    Amendment

At the conclusion of her supplemental opposition, Hall claimed entitlement to yet another opportunity to amend her complaint . . . should "all else fail[ ]." Certainly, a court is required to freely grant leave to amend when justice so requires it. FED. R. CIV. P. 15(a)(2). However, the court already has done so – twice. Moreover, a court may deny leave when the plaintiff neither provides a copy of the proposed amended complaint, nor explains how the proposed pleading would cure the deficiencies in the initial complaint. *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021), *as revised* (Nov. 26, 2021).

Hall's conditional request for leave to file a theoretical, third amended complaint to set forth unspecified facts does not comply with Rule 15 and is DENIED. [17]

### Conclusion

As instructed by *Iqbal*, the court has accorded no weight to the conclusory allegations set forth in plaintiff's complaint. *See Iqbal, supra*. Plaintiff's remaining allegations contain facts sufficient to confer plausibility only upon her claims for hostile work environment, discrimination, and retaliation against  1) LMC under Title VII; 2) Sheriff Brown, in his official

---

[17] Because the recommended resolution of the instant motion disposes of less than all claims and parties, it is not a final judgment and, therefore, remains subject to revision at any time before conclusion of the case. FED. R. CIV. P. 54(b). Consequently, if plaintiff uncovers facts sufficient to support a dismissed claim, then she may seek reconsideration of the court's dismissal of those claims, together with a proposed amended complaint. It goes without saying, however, that plaintiff may not dither in her efforts.

37

capacity, under Title VII and § 1981 through § 1983; plus 3) Warden Ducote, in his individual capacity, under § 1981 through § 1983 for discrimination and hostile work environment only.

Accordingly,

IT IS RECOMMENDED that the Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted [doc. # 20], as supplemented, filed by defendants, Defendants, LaSalle Management Company, L.L.C.; Sheriff Andy Brown; and Warden Tim Ducote be GRANTED IN PART, and that the following claims be DISMISSED WITH PREJUDICE:

1) Plaintiff's claims against LaSalle Management Company, L.L.C. under 42 U.S.C. § 1981 through § 1983;

2) Plaintiff's claims against Sheriff Andy Brown in his individual capacity; and

3) Plaintiff's claims against Warden Tim Ducote, in his official capacity; any Title VII claims asserted against him; and her retaliation claim against him under 42 U.S.C. § 1981 through § 1983.

IT IS FURTHER RECOMMENDED that the motion to dismiss [doc. # 20], as supplemented, otherwise be DENIED.[18]

---

[18] To the extent that the undersigned has expanded upon, or diverged from the grounds for dismissal urged by movants, the instant report and recommendation provides adequate notice to the parties. *McCoy v. Wade*, 2007 WL 1098738, *1 (W.D. La. Mar. 12, 2007) (the report and recommendation itself provides adequate notice to the parties). In any event, the court possesses the inherent authority to dismiss a party sua sponte. *McCullough v. Lynaugh*, 835 F.2d 1126, 1127 (5th Cir. 1988) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)); *see also Spann v. Woods*, 1995 WL 534901 (5th Cir. 1995) (unpubl.) (the district court sua sponte dismissed claims under 12(b)(6) although the defendants never filed a motion to dismiss, nor did they plead failure to state a claim in their answer).

Under the provisions of 28 U.S.C. §636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he or she makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this **18th day of July, 2022**.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE